No. 26-1241

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**JAMES YATES**,

Plaintiff-Appellant,

v.

**FRANCONNECT, LLC**,

Defendant-Appellee.

On Appeal from the United States District Court For the Eastern District of Virginia at Alexandria, Case No. 1:25-cv-00540, Hon. Leonie M. Brinkema

APPELLANT'S OPENING BRIEF
IN FAVOR OF SUMMARY JUDGMENT REVERSAL

Monique A. Miles, Esquire
OLD TOWNE ASSOCIATES, P.C.
201 N. Union Street, Ste. 110
Alexandria, Virginia 22314
(Ph) 703-519-6810
mmiles@oldtowneassociates.com

Arinderjit Dhali
Dhali PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
(Ph) 202-556-1285
ajdhali@shalilaw.com

Attorneys for Plaintiff-Appellant James Yates

July 21, 2026

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. **26-1241**     Caption: **James Yates v. FranConnect, LLC**

Pursuant to FRAP 26.1 and Local Rule 26.1,

**James Yates**
(name of party/amicus)

who is _____ **the appellant** _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐ YES ☑ NO
     If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____     Date: _____03/17/2026_____

Counsel for: James Yates _____

- 2 -

# Table of Contents

Corporate Disclosure Statement…………………………………………….…………......i

Table of Contents ................................................................................................. ii

Table of Authorities ..............................................................................................v

Jurisdictional Statement ........................................................................................1

Issues Presented for Review..................................................................................1

Statement of the Case ............................................................................................3

    I.    Factual Background..................................................................................3

        A. Yates' Recruitment, Hire, and Strong Performance .............................3

        B. Discriminatory Treatment Begins When Dan Palay Becomes Yates' Manager...............................................................................................7

            1. FranConnect's VP of Revenue Operations Acknowledges Yates' Less Favorable Treatment Compared to His White Peers, Bart Van Dessel and Jessy McGarry .......................................................7

            2. Yates' Boss, Palay, Acknowledges He Gave Enterprise Accounts to Mid-Market Rep McGarry and to Another Enterprise Rep Griffin, and That He Was Not Sure Whether Fairness In Assigning Accounts Was a Top Priority .......................................................9

            3. Selective Enforcement and Violation of Company Policies..........11

        C. Yates was Paid Less Than His White Peers........................................14

        D. Yates' Protected Activity and Retaliation...........................................15

    II.    Procedural Background .........................................................................17

Standard of Review ..............................................................................................21

Summary of Argument.................................................................22

Argument....................................................................................26

I.  The district court erred in granting summary judgment on Yates' race
    discrimination claims..........................................................26

    a.  Yates established a prima facie case of race discrimination and
        presented substantial evidence creating genuine disputes of material
        fact .............................................................................26

        i.  Yates was meeting FranConnect's legitimate performance
            expectations ..........................................................30

        ii. Similarly situated White employees were treated more
            favorably than Yates ..............................................31

    b.  FranConnect's reasons for the adverse treatment are pretextual ........35

II. The district court erred in granting summary judgment on Yates' pay
    discrimination claims..........................................................37

    a.  Yates established a prima facie case of pay discrimination................37

III. The district court erred in granting summary judgment on Yates'
    retaliation claims ...............................................................39

    a.  Yates established a prima facie case of retaliation ............................39

IV. The district court erred in granting summary judgment on Yates' VWPL
    claims...............................................................................43

Conclusion..................................................................................43

Request for Oral Argument ............................................................45

Certificate of Compliance ..............................................................46

Certificate of Service.................................................................47

# Table of Authorities

**Cases**                                                                                              **Page(s)**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ...............................22

Chapman v. Oakland Living Ctr., Inc., 48 F.4th 222 (2022) ..............................27

Cowgill v. First Data Techs., Inc., 41 F.4th 370 (4th Cir. 2022) ..............31, 32, 36

EEOC v. Warfield-Rohr Casket Co., 364 F.3d 160 (4th Cir. 2004) ....................27

Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344 (6th Cir. 1998) ........31

Evans v. Int'l Paper Co., 936 F.3d 183(4th Cir. 2019)...........................................21

Evans v. Techs. Applications & Serv. Co, 80 F.3d at 954 (4th Cir. 1996) .....21, 22

Gillins v. Berkeley Elec. Coop., 148 F.3d 413 (4th Cir. 1998) ..........................21

Haynes v. Waste Connections, Inc., 922 F.3d 219 (4th Cir. 2019) ......................31

Herkert v. Bisignano, 151 F.4th 157, 164 (4th Cir. 2025) .............................29, 40

Hollis v. Morgan State Univ., 153 F.4th 369 (4th 2025) .............21, 28, 29, 36, 40

Jackson v. Blue Dolphin Communs. of N.C., LLC, 359 F. Supp. 2d 442
(W.D.N.C. 2004) ...............................................................................................27

Jackson v. Univ. of Pittsburgh, 826 F.2d 230 (3d Cir. 1987) ........................27, 28

Kess v. Mun. Emples. Credit Union of Balt., Inc., 319 F. Supp. 2d 637 (4th Cir.
2004) .................................................................................................................37

Love-Lane v. Martin, 355 F.3d 766 (4th Cir. 2004) ............................................28

Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289 (4th Cir. 2010) ..........36

Smith v. CSRA, 12 F.4th 396 (4th Cir. 2021) .....................................................35

Strata Solar, LLC v. Fall Line Constr., LLC, 683 F. Supp. 3d 503 (4th Cir. 2023) .................................................................................................................................28

Strothers v. City of Laurel, 895 F.3d 317 (4th Cir. 2018) ........................28, 39, 42

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977) .....36

Wannamaker-Amos v. Purem Novi, Inc., 126 F.4th 244 (4th Cir. 2025) ............36

## Statutes

28 U.S.C. § 1291 ....................................................................................................1

28 U.S.C. §§ 1331....................................................................................................1

28 U.S.C. §§ 1367....................................................................................................1

42 U.S.C. § 1981 .....................................................................................................1

42 U.S.C. § 2000e ...................................................................................................1

42 U.S.C. § 2000e-2 ..............................................................................................37

Va. Code § 2.2-3900 ...............................................................................................1

Va. Code § 40.1-27.3 ..............................................................................................1

# JURISDICTIONAL STATEMENT

Appellant James "Chris" Yates ("Yates" or "Appellant") brought this matter against his former employer, FranConnect, LLC ("FranConnect" or "Appellee"), alleging discrimination (race and pay) and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, the Virginia Human Rights Act, Va. Code § 2.2-3900 et seq., and the Virginia Whistleblower Protection Law ("VWPL"), Va. Code § 40.1-27.3. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. On February 27, 2026, the district court granted FranConnect's motion for summary judgment, disposing of all of Yates's claims. Yates filed a notice of appeal on February 27, 2026. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Was there a triable issue concerning whether the district court improperly failed to consider the totality of the circumstantial evidence in wholly discounting Yates' affidavit and overlooking the thirty-two other exhibits he presented as circumstantial evidence of discrimination and retaliation and instead weighed and resolved credibility determinations in FranConnect's favor?

2. Did the district court err in granting summary judgment when genuine disputes of material fact exist regarding whether race was a motivating factor in FranConnect placing Yates on multiple PIPs in violation of FranConnect's express (1) progressive discipline policy when he received no prior performance feedback from his supervisor, and (2) sales team's performance and PIP policy when his

1

lesser-performing White sales team peers were not placed PIPs when he was? Did the district court err in granting summary judgment when genuine disputes of material fact exist regarding whether the "lateral role" FranConnect offered Yates (only after his protected activity of making HR complaints and Employment Opportunity Commission ("EEOC") complaint) constituted a demotion given the diminished earning potential?

3. Did the district court err in granting summary judgment when genuine disputes of material fact exist regarding whether the White peers cited by Yates as comparators in his opposition were similarly situated to Yates.

4. Did the district court err in granting summary judgment when genuine disputes of material fact exist regarding FranConnect's shifting reasons for termination, i.e. reason #1 – Yates' refusal to accept a "lateral role", and reason #2 - Yates was terminated for performance, and whether that shift evidences pretext given his prior and ongoing protected activity?

5. Did the district court err in granting summary judgment on Yates' VWPL claim when FranConnect's Motion for Summary Judgment and its Memorandum in Support of Summary Judgment, do not request that the court dismiss Yates' VWPL claim?

6. Did the district court err in granting summary judgment when genuine disputes of material fact exist regarding why Yates' White sales team peers were paid more than him and his White replacement was paid more than him during her ramping period and was assigned a lower quota than him when he was ramping?

**STATEMENT OF THE CASE**

## I.     Factual Background

A. Yates's Recruitment, Hire, and Strong Performance

James Yates is a Black sales professional with over ten years of proven sales experience. Prior to joining FranConnect, Yates was a District Sales Manager at ADP for 4-plus years. JA 2257. Yates was also the Territory Manager of Heartland Payment Systems for 3 years. Id.

In March 2023, FranConnect hired Yates as an Enterprise Sales Manager. JA 2346. Yates was the only Black man on his sales team. In 2024, Yates was the Number 3 top-performing sales representative out of his team of twenty-one (21) sales producers, with $43,000 in closed deals. JA 2469.

In December 2024, Yates also successfully closed one of the largest deals in company history: the SnowFox account. JA 779-780 (152:3-153:3). FranConnect's own Interim CRO and Sales Consultant, John Stopper, whom Palay conceded has "good sales experience" and whom FranConnect pays to train its sales staff, stated in a LinkedIn post, the *very same day* FranConnect's Senior Vice President of People, Stephanie Opoku, fired Yates for not taking the "lateral role", that Yates "finished the year as **one of the top-producing reps in the company, closing some of the largest deals in company history**." JA 2457-2458 & JA 390-393 (255:11 –

3

258:18)(emph. added). Stopper emailed this article directly to Yates stating that Yates was the inspiration for it. JA 2457-2458.

Yates' 2023 annual performance review, written by his then-supervisor Molly Aiken, gave him an overall "good performance/strong performance" rating of 3.5. JA 2409. The review stated:

"Despite falling short of his sales quota for the year and finishing approximately 55% to target, the majority of his sales occurred in Q4, where he secured notable deals with clients such as Snowfox, Phoenix Brands, and Hungry Howie's. **Closing Q4 at over 100% to his quota with $46k in bookings (118% to target)**, Chris demonstrated significant growth and achievement." Id. The review further noted: "His ability to navigate the sales landscape is evident, and provided he maintains his pipeline generation, Chris is poised for a stellar year ahead. We eagerly anticipate seeing him sustain his sales momentum and achieve continued success throughout the coming year." Id. (emphasis added).

Notably, Yates' new manager, Palay, received a 3.5 rating on his annual review like Yates. JA 214-215 (79:10 - 80:6) (Palay admits that a 3.5 score is a **"strong score"** and that he was not disappointed to receive it himself).

Yates outperformed his White peers in his reviews.

For instance, Volatile (White female) only received a 2.75 rating in her 2023 annual performance review (JA 2411 – 2413) and a 2.5 rating in her 2024 review

4

(JA 2414 – 2416), compared to Yates' 3.5 "strong score" in 2023. AJ Griffin (White female) only received a 3.0 rating on her 2024 annual performance review. JA 2417 - 2419. Neither Volatile or Griffin were placed on PIPs.

In 2024, only 2 of 21 sales representatives hit their quota; meaning 90.5% of the sales team <u>failed to meet targets</u>, which was a systemic issue for the team. <u>See</u> JA 2469. Yates finished Number 3 overall at the end of FY 2024; i.e. he surpassed 18 of his White sales peers. <u>Id</u>.

Volatile found FranConnect's claim that Yates was one of the lowest-performing employees in 2024 questionable. Volatile testified that she had seen the sales leaderboard rankings and considered Yates' placement on a PIP to be "crazy." JA 2438-2439, 2441 (99:21-101:3; 105:7-18);

        A     <mark>You're killing it. Crazy you got PIP'd.</mark>

Page 95

<u>see also</u> JA 2454-2445, 2456; JA 2459, 2460, 2470

Volatile testified that Yates was a good salesperson, tried new things, thought outside the box, was not sitting complacent, did a good job, and tried to help his fellow sales team members. JA 2435-2437 (71:21-73:5).

A What did I observe about Chris? Chris was an awesome, he's a nice guy. He, he gets along great with coworkers. He drove in from Baltimore once a, whenever we were supposed to, we both had that same kind of once a, once a week cadence. And, yeah, I mean, I seemed like a great guy.

Page 71

A So he was on a different team than me. I wasn't able to see the ins and outs of everything, but from what I could see from where I was, he seemed like he was a good salesperson, that he was trying new things. He thought outside the box. He was not sitting complacent. I think Chris did a good job.

Page 72

A From my, from my vantage point, again, like watching him, it seemed that he had a lot of good ideas. The team is very, like we get together and talk about ideas and talk about new things that we can do. And he always had great ideas and again, like thought outside the box, brought to the team, some ideas that others hadn't thought about. He seemed like he was doing a good job.

Page 72

> A     When he would find a new outreach technique or something that he thought was working, he would pass it to the team in our group discussions.

Page 73

Yet, FranConnect now claims that Yates was a poor performer as one of its shifting pretextual reasons for firing Yates.

B. Discriminatory Treatment Begins When Dan Palay Becomes Yates' Manager

The discriminatory treatment Yates faced at FranConnect as the sole Black member of the sales team commenced when his former boss, Aiken, left in December 2023 and Palay became his new boss in January 2024.

1. **FranConnect's VP of Revenue Operations Acknowledges Yates' Less Favorable Treatment Compared to His White Peers, Bart Van Dessel and Jessy McGarry**

FranConnect's VP of Revenue Operations, Larissa Levine, testified during that Yates' White peer, Bart Van Dessel, an Enterprise sales representative ("rep"), was able to sell to both existing and prospective "aka" new logo accounts unlike Yates, who was also an Enterprise sales rep. JA 678-679 (51:12-52:11). They allowed Van Dessel to operate in a hybrid role giving him more favorable treatment than Yates. Van Dessel's territory had fifty-one current customers, whereas, Yates possessed only four current customers and primarily had to secure new accounts through prospects. JA 687-688 (60:5-61:7). Yates addressed the unfair advantage

Palay gave Van Dessel with account assignments and by reassigning his accounts to Van Dessel in his declaration. JA 2350-2353 (¶¶ 8, 15, 18, 27).

Also, per company standard practice, Enterprise sales accounts were to be assigned to Enterprise Sales Representatives given the nature of their higher sales quotas, whereas Mid-Market accounts were to be assigned to Mid-Market Sales Representatives who had lower sales quotas. Levine testified that McGarry, as a White Mid-Market representative, was given some of Yates' Enterprise accounts even though her Mid-Market rep quota was not as high of a quota as his Enterprise sales rep quota. See JA 721-723 (94:2-96:1). In doing so, she acknowledges McGarry's more favorable treatment than Yates.

Key admissions against interest for FranConnect are that Levine testified that that there was no written policy on how sales territory distributions were handled (assigned and reassigned) amongst sales reps and that it was left up to manager discretion (i.e. Palay), and that territory was a factor in driving sales performance. JA 703-704 (76:14-77:8). Palay also confirmed that there was no written policy on territory distributions amongst sales reps. JA 2377 (82:4 – 15). Opoku also states that there was not a policy for territory distribution and how that lead to "inconsistencies with how accounts are handled and when. . . I think that there were points in the situation with [Yates], Dan, and team where that wasn't consistently

8

handled." JA 976-977 (130:16-132:6). She went on to say that left gaps for situations "to be handled **differently**." JA 977-965 (132:19-133:3) (emph. added).

## 2. Yates' Boss, Palay, Acknowledges He Gave Enterprise Accounts to Mid-Market Rep McGarry and to Another Enterprise Rep Griffin, and That He Was Not Sure Whether Fairness In Assigning Accounts Was a Top Priority

Palay had a pattern of giving McGarry, a Mid-Market rep, Enterprise accounts that Yates should have retained as an Enterprise rep. On March 13, 2024, another lucrative Enterprise sales account, Foodtastic (1,200+ locations), was given to McGarry despite Yates having requested this specific account be assigned to him. JA 2462. Yates addressed his concern with Palay assigning McGarry, a mid-market rep, Enterprise accounts, and him not having access to those accounts to meet his larger quota. JA 2461. Palay admitted that a Mid-Market account executive might be given an enterprise account at *his discretion* because "[he] believe[s] they were *the right person* at that specific time to work that account." JA 2406 - 2407 (265:11 – 266:2) (emph. added).

On March 27, 2024, Palay took a high-value lead that was an Enterprise account, Fantastic Sams (300+ locations) and reassigned it to McGarry. JA 2463-2464; see also JA 2340, 2342-2243 (¶¶ 8, 22, 23). McGarry ultimately closed the deal, depriving Yates of a major account and hindering his ability to meet his higher quota. JA 2443.  Similarly, in October 2024, which was out of season for account reassignments, Palay allowed Yates' White colleague, Amanda Griffin, an

Enterprise sales rep, to review and poach Yates' accounts. JA 2341, 2343 (¶¶ 18, 27), JA 2347. Palay went on to inexplicably reassign several of Yates' accounts— including Aurify Brands, Charleys Philly Steaks, Gong Cha, Marco's Pizza, RSM US LLP, SSCP Management, Inc., Thrive Restaurant Group, Wendy's, and Wow Bao to Griffin without justification. Id. Worse yet, despite Yates being more tenured than Griffin, Palay selected Griffin to attend the Restaurant Finance and Development Conference ("RFDC") "on [Yates'] behalf" and did not give him the opportunity to attend. JA 2348. After the event, the Chief Revenue Officer ("CRO") Austen Asadorian wanted Griffin to schedule meetings with Yates' clients. JA 2340 (¶ 10).

Key admissions against interest for FranConnect are that Palay testified that (1) *he was not sure* that fairness in assigning accounts was his top priority, JA 349 - 350 (214:21-215:18), and (2) that he could not recall receiving *any* race discrimination training as a manager. JA 387 (252:1-19). Palay also stated that *he was not familiar* with FranConnect's policy handbook to know whether FranConnect has any policies on discrimination or harassment. JA 388-391 (251:22 – 254:17). He admits that he did not receive any coaching on discrimination or how to handle situations of discrimination or retaliation. JA 2378 (83:15-19).

**3. Selective Enforcement and Violation of Company Policies**

    a.    FranConnect Violated Its Own Written Policies In Not Enforcing Them Against Yates' White Peers Preston Hall, Annie Van Pelt, Daniel Chapman, AJ Griffin, & Amy Volatile

    i.    <u>FranConnect's Sales Team PIP & Termination Policy</u>

On February 15, 2024, Asadorian emailed *all sales staff* stating that *any sales representative* performing under 50% of quota would be placed on a PIP, and *any sales representative* who failed to achieve at least 80% of their quota the next month would be terminated. JA 2465-2466**.** This was an objective standard <u>for the entire sales team</u> regardless of whether the supervisor was Palay or the other sales team supervisor, Philip Chang and regardless of whether they were Enterprise, Mid-Market, or Small and Medium Size Business ("SMB") reps. Palay knew about this policy. JA 245-247 (110:7-112:9). This policy should have been applied uniformly but was enforced *only against* Yates despite multiple White employees not meeting the policy requirements.

In 2024, only two of twenty-one sales representatives hit their quota: Jessy McGarry and Bart Van Dessel, meaning that 90.5% of the sales team entirely failed to hit their quota. JA 2469. This statistic directly contradicts FranConnect's portrayal of Yates's 2024 performance struggles as individual to him rather than common across the sales team. Palay admitted during his deposition that in some instances sales reps who did not hit their sales quota *were not disciplined at all*. JA 240 - 241

(105: 22 – 106:12). He stated that he did not think any *employees he supervised on the sales team* [except Yates] *were disciplined in January or February 2025*. JA 237 - 238 (102:11-103:11). This despite Palay stating that seven of his direct reports did not meet their monthly quota attainment like Yates between December 2023 and January 2025 and that no employees he supervised on the sales team who missed their quotas were disciplined *except for Yates*. See JA 378 - 379 (243:6 – 244:9).

ii.        FranConnect's Progressive Discipline Policy

FranConnect's Progressive Discipline Policy states that the company has "adopted a system of progressive discipline to respond to employee job-related problems" with the goal of "notify[ing] employees of work-related problems, remind[ing] them about their responsibilities, and reiterating job performance expectations." JA 2468. The policy requires that employees be given notice and an opportunity to improve before formal discipline is imposed. Id.

On June 10, 2024, Palay placed Yates on his first PIP without ever providing him any notice or an opportunity to improve. See JA 2425, 619 (incomplete version from FranConnect).

When asked during his deposition what written feedback he had given Yates before the June 2024 PIP, Palay responded that the only thing that came to mind was Yates' "annual performance review," which he incorrectly attributed to Asadorian. JA 219 (84:11-21). Yates received his 2023 review on January 12, 2024, which

Aiken (not Asadorian) wrote. JA 2408 - 2410. Yates never received a 2024 review. The PIP required Yates to close $13,000 in new business in monthly recurring revenue ("MRR"), secure a new logo account, generate four new leads, be present in the office once per week, and maintain CRM hygiene. JA 2425.

Yates successfully met and exceeded all PIP benchmarks by selling $13,500 in MRR by August 2024. Id. His quota was much higher than his White peers due to the PIP requirements. JA 2329 (¶20). At her deposition, Opoku acknowledged his "**successful completion**" of the PIP and her August 20, 2024 email describing Yates fulfilling his PIP requirements, JA 2439 (183:18-21). She also confirmed, "**He did well, yes**." Id. Despite Yates' success Palay unexpectedly placed Yates on a second PIP, followed by a third PIP between June and December 2024, with progressively more demanding and unattainable goals that only he was subjected to. JA 2425-2426. This, despite Palay stating that enterprise new logo deals on average take longer to close because of the larger purchases with larger buying committees with more complex buying cycles. JA 2389 - 2391 (106:20 – 108:15).

Palay could not justify why the other White individuals he supervised (Preston Hall, Annie Van Pelt, Daniel Chapman, AJ Griffin, Amy Volatile) were not put on PIPs despite missing their 2024 quota attainment like Yates. JA 2398-2401 (247:15 – 250:1). FranConnect allowed Jessica Morley-Hillen, Yates' White comparator, who was Chang's subordinate, who did not successfully complete her PIP to

13

continue working at FranConnect without being put on second or third PIPs like Yates. JA 2408-2411. Morley-Hillen also earned a higher salary than Yates. JA 625. Opoku said that PIPs could have been renewed for other employees (read Morley-Hillen), but "we didn't," which is not how they treated their only Black sales rep, Yates, when they renewed his PIP, not once, but thrice. JA 1284-1285 (157:10-158:6.). Opoku also made a statement against interest during her deposition that it was the first time that FranConnect PIP'd someone in an Enterprise role when they placed Yates on a PIP. JA 2451 (168:6-12). She also admitted that the difference between other employees and Yates was that his deals took longer to close than SMB reps' deals who don't need as much time to show sustained improvement. JA 1284-1285 (157:10-158:6). Palay admitted that Yates showed improvement over time yet said he still fired him while Yates' lesser performing White peers who were never PIP'd (let alone disciplined) remained employed. JA 277-278 (142:17-143:19).

C. <u>Yates was Paid Less Than His White Peers</u>

Evidence produced by FranConnect confirms that two of Yates' white colleagues—Andrew Masterson and Amanda Griffin, both Enterprise sales reps—were earning more base salary than he was in the same role despite both being less tenured than him. JA 625. Yates was hired in March 2023 with a base salary of $120,000, Masterson was hired in December of 2023 with a base salary of $145,000, and Griffin was hired in April of 2024 with a base salary of $135,000. <u>Id</u>. Yates'

White replacement, Heather Menster, who was hired in February 2025 (the month after Yates was fired) was assigned a lower quota than Yates when he started at FranConnect, despite her higher base salary of $130,000.08. JA 2341 (¶14), JA 625.

D. <u>Yates' Protected Activity and Retaliation</u>

On December 2, 2024, Yates lodged his first complaint with Opoku (HR), reporting race discrimination with account assignments and reassignments, PIP placement, inconsistent application of high performance expectations, and the in-office policy enforcement. JA 2427-2429. On December 5, 2024, Yates met with Opoku, who apologized after Yates described the discrimination he had faced and stated she would conduct an internal investigation. JA 1251-1252 (124:1-125:19) (Opoku also admitted that Palay was not formally coached and that after Yates filed his EEOC complaint, HR did not implement any measures to ensure he was not being retaliated against because she believed "*the business practices were fair and that there was nothing to change*"). During her investigation of Yates' complaints, Opoku admitted that the only people she interviewed was his boss, Palay, and Asadorian whom Yates alleges discriminated against him. JA 1313 - 1314 (186:18-187:9) & JA 1122. A key admission against interest is that Opoku said she did not review or compare sales performance data, quota attainment, or PIP records between Yates and his White peers as part of her investigation into his race discrimination and disparate discipline complaints. <u>Id</u>.

15

On December 11, 2024, Yates filed a charge with the EEOC alleging race and pay discrimination and retaliation. Opoku admitted to receiving an email from the EEOC (notifying her of Yates' complaint). JA 1244 (117:2-18). On December 16, 2024, Yates met with Opoku where she told him the HR investigation findings. She confirmed inconsistencies in relevant processes, specifically confirming that Palay was not following company policy regarding Yates in how and when his accounts were reassigned, in contrast to his White peers. See JA 1259 - 1260 (132:19-133:3). Specifically, Opoku acknowledged that Yates was not able to work his accounts for the entire sales year, in contrast to his non-Black colleagues who were able to work their accounts for the entire sales year. She also shared planned 2025 policy changes to prevent unfair account transfers and updated PIP criteria to differentiate sales roles, as discussed above. When pressed, Palay stated that he became aware of Yates' race complaints after Opoku discussed it with him in December 2024, after first stating that he did not remember when he learned of Yates' complaints. JA 2367 - 2373 (47: 8– 53:8).

On December 30, 2024, instead of addressing the discrimination, FranConnect retaliated against Yates by offering him two options: (1) move to a lesser Enterprise Account Manager role on January 12, 2025, with significantly lower earning potential (despite the same base salary), as the average deal size for

16

Enterprise new logo is $8.1K, compared to Enterprise upsell at $2.6K, or (2) take a severance package of only 2 months of salary and 2 months of COBRA. JA 2430.

In an attempt to express his concerns about the new position offer and to negotiate better terms, on January 13, 2025, Yates communicated to Opoku the reasons why he could not accept the lesser position as offered, and noted that the offer was extended only <u>after</u> he had engaged in protected activity, and how based on the retaliation he had "serious concerns about FranConnect's commitment to equitable treatment and professionalism." JA 2431-2432. Yates also informed Opoku that since filing his EEOC claim, he had been retaliated against with heightened performance monitoring, false allegations being made about his sales metrics, and the ultimatum FranConnect gave him to either accept the lesser role or face termination. <u>See</u> JA 2431-2432 & JA 2344 (¶29). In response, Opoku fired him via email that same day stating, "*Given that you did not accept the lateral role offering, we are terminating your employment effective immediately*." JA 2433.

A month later, FranConnect replaced Yates with a White woman (Menster) JA 2341 (¶14).

## II. Procedural Background

Yates filed his initial Complaint on March 27, 2025. FranConnect moved to dismiss, which the Court partially denied. Yates filed his Amended Complaint on July 24, 2025, to which FranConnect Answered. FranConnect filed a Motion for

Summary Judgment on December 16, 2025, and a corrected Memorandum in Support on January 20, 2026. Yates filed his Opposition to same on February 11, 2026, supported by thirty-three exhibits including deposition testimony from FranConnect's the SVP of People (HR), Opoku, and his direct manager, Palay, and the VP of Revenue Operations, Levine; performance reviews; an email documenting Yates' successful completion of his PIP; 2024 Sales Team PIP & Termination Policy; the FY 2024 End of Year Sales Team Leaderboard; FranConnect's progressive discipline policy, and contemporaneous communications between Yates and management regarding his discrimination and retaliation complaints and from his colleagues expressing their surprise at his firing.

At the Motion for Summary Judgment Hearing, not once did the district court, even reference "circumstantial evidence" or "pretext" during the hearing. The district court only referenced that "there was no **direct** evidence of racial hostility in this case." The district court failed to acknowledge the circumstantial evidence presented in the 33 exhibits that Yates submitted in his opposition and instead focused solely on his declaration (as though that was the only shred of evidence he offered when he had included 32 other exhibits) concluding that the evidence didn't support racial bias. JA 6 - 7 (4:12- 5:18). The district court also improperly found that there were no comparators in Yates' case because "there weren't very many people at that executive level in the enterprise operation," which demonstrates that

18

the district court misunderstood Yates' case claims. <u>Id</u>. at 7 (5:19-24). Enterprise reps were not executive level nor were the account managers people managers, the company just used the terms Account Manager or Account Executive. Yates distinguished for the district court that Palay allowed White Enterprise reps to sell in both the new logo(Account Executive) and current client (Account Manager) accounts

The district court also held, "[T]here is really no evidence that the plaintiff was satisfactorily performing his job," and stated, "the uncontested evidence in this case is that the plaintiff was put on three separate performance improvement plans," without referencing once that none of his White peers who also failed the Sales Team PIP & Termination policy were not disciplined at all, not even Volatile who admitted to her poor sales performance. JA 8 - 9 (6:21-7:7).

The district court reasoned that Yates was offered an opportunity to go from "the executive position to the management position. . ." and how that "would not have resulted in any greatly significant difference in financial benefit to him" which was not accurate. JA 9 (7:8-16). First, the position was not a management position. Second, the average deal size for an Enterprise new logo account is $8.1K, compared to an Enterprise upsell account at $2.6K. JA 2430. Without analyzing Yates' skills, the district court went on to vaguely state, "His skill set would appear to have been better as a manager, but he chose to reject that position," JA 9 (7:20-23), before

19

stating, '[He clearly cannot satisfy the - - on the evidence in this case. . ." <u>Id</u>. at (7:22-23). This just shows the district court largely misunderstood the nature of the new job offer.

The district court also stated in reference to Yates' discrimination claims that just being put on a performance improvement plan was not considered an adverse employment action, which ignored the other adverse actions Yates cited in his opposition (account reassignments that reduced his commissions and his termination). JA 10 (8:3-7).

The district court reasoned that based on a pay chart that FranConnect produced, there was only "a $15,000 difference" in pay between Yates' White peer Griffin, but did not make *any* reference to Masterson, Yates' other White comparator who started with a base salary that was $25,000 more than his. JA 625, JA 10 (8:8-18). Also, the court did not reference Yates' White replacement, Menster, being paid $10,000.08 more than him despite being assigned a lower quota than him. JA 625 and JA 2341 (¶14).

The district court did not do a full legal analysis of Yates' retaliation claims, but instead minimized Yates' retaliation claims to only part of what he complained of on December 2nd in JA 2427 - 2429, wholly leaving out that he had also complained of discriminatory enforcement of the in-office policy, and that he had also filed an EEOC complaint that management was aware of, and had ongoing

meetings to discuss his complaints with HR, and that his final email to Opoku that led to his same day firing referenced the ongoing retaliation and his fear of further retaliation. JA 2431-2432, JA 11 (9:1-5). While the district court recognized the temporal proximity for his termination, it inappropriately characterized the new job offer as not being onerous and simply stated that because he did not accept that offer that his case would not "hold up on a retaliation claim". JA 11 - 12 (9:23-10:7). Lastly, the court reasoned that there were no material facts at issue to support *any* of Yates' legal claims. JA 12 (10:8-16). The district court's February 27, 2026 order granted FranConnect's Motion for Summary Judgment dismissing all of Yates' claims. JA 1. Yates timely filed his Notice of Appeal on February 27, 2026. JA 2512 - 2513.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo Evans v. Int'l Paper Co., 936 F.3d 183, 191 (4th Cir. 2019). "[A]ny permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion," here, Yates. Gillins v. Berkeley Elec. Coop., 148 F.3d 413, 415 (4th Cir. 1998). "In cases arising in the employment discrimination context, "courts must take special care when considering a motion for summary judgment . . . because motive is often the critical issue." Hollis v. Morgan State Univ., 153 F.4th 369, 378-379 (4th 2025) citing Evans

21

v. Techs. Applications & Serv. Co, 80 F.3d at 954, 958 (4th Cir. 1996). If Yates "show[s] that there is a genuine issue for trial," this Court should reverse. Evans, 936 F.3d at 191 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

## Summary of Argument

The district court erred in granting summary judgment to FranConnect because genuine disputes of material fact permeate this record, and those disputes—particularly concerning discriminatory motive, pretext, and the comparability of similarly situated employees—must be resolved by a jury, not a judge on summary judgment.

First, Yates established a prima facie case of race discrimination and presented substantial circumstantial evidence in his opposition (Yates' affidavit and thirty-two other exhibits), that the district court erred in ignoring/discounting, from which a reasonable jury could infer that race discrimination motivated FranConnect's adverse employment actions against Yates. Notably, he was the only Black man on the sales team and was subjected to a pattern of discriminatory treatment that began immediately when Palay became his new boss in January 2024. Palay deprived him of working certain Enterprise accounts and reassigned some of his Enterprise accounts to White colleagues, some of whom were not even Enterprise sales reps, which adversely affected his goal attainment and his finances in the form of lost commissions.

Opoku apologized to Yates and acknowledged that Palay handled Yates' accounts differently [than his peers].

Yates was placed on three successive PIPs while 18 of his White peers who performed worse than him were not disciplined at all during Yates' tenure. FranConnect violated its written Sales Team PIP & Termination Policy in doing so, and also violated its Progressive Discipline Policy by not first giving Yates notice or an opportunity to improve before formally disciplining him unlike how Palay treated his White peers.

Yates was also paid less than his White peers in the same role. He was replaced by a White woman six weeks after being fired who received a lower sales quota and higher pay than Yates during her ramping period. All of this raises a genuine issue of whether race was a motivating factor in FranConnect's adverse actions. A reasonable jury could find it was.

Second, FranConnect's failure to follow its own progressive discipline policy and Palay's admission that he provided no written performance feedback before Yates' first PIP create genuine issues regarding whether the PIPs were pretextual. These are quintessential jury questions that cannot be resolved on summary judgment.

Third, genuine disputes exist regarding whether Yates' White colleagues were similarly situated to be considered his comparators. Palay identified White peers

who missed the objective requirements of the Sales Team PIP & Termination Policy in 2024 but were not disciplined, placed on PIPs, demoted, or terminated.

The district court erred in resolving these disputed comparisons on summary judgment rather than allowing a jury to assess whether Yates and his comparators were similarly situated. The district court improperly resolved this factual question by crediting FranConnect's characterization of job roles and account assignments, which conveniently ignored the objective Sales Team PIP & Termination Policy that applied *to all sales staff* including those same White peers who missed the requirements of that policy like Yates had. Additionally, the record shows that Yates' White peers were permitted to work outside their assigned segments—Van Dessel and McGarry were both allowed to function in a hybrid role in selling to broader market segments of Enterprise accounts—while Yates alone was confined to Enterprise new logo accounts which Opoku and Palay both acknowledged had longer sales cycles. He was held to stricter performance standards with the highest quota of the team during his PIPs. Whether employees are similarly situated is a fact-intensive inquiry that must be submitted to a jury when, as here, the record supports competing inferences that establish genuine disputes of material fact.

Fourth, genuine disputes exist regarding whether FranConnect's shifting reasons for termination are pretextual. FranConnect claims Yates was fired the same day he engaged in protected activity with Opoku (HR) informing her why the

"lateral" role was a demotion and that he feared the ongoing retaliation he was facing since complaining of discrimination and filing an EEOC charge. The evidence shows the lateral role had significantly reduced earning potential.

The temporal proximity between Yates' protected activity (December 2 and 11, 2024 and January 13, 2025) and his termination (January 13, 2025), combined with Opoku's apology and her admission that Palay was handling Yates' accounts differently, and Palay's admission that he was aware of Yates' protected activity creates a genuine issue of whether retaliation motivated the termination.

Also, FranConnect changed its reason for firing Yates and later asserted that he was terminated for performance deficiencies, despite not firing any of Yates' White peers during his tenure who also failed to meet the Sales Team PIP & Termination Policy requirements.

These shifting explanations and the temporal proximity between Yates' protected activity and his termination alone further create genuine disputes regarding pretext and FranConnect's retaliatory motive for firing Yates.

<u>Fifth</u>, the district court erred in granting summary judgment on Appellant's pay discrimination claims. Appellant presented evidence that he, a Black male, was paid substantially less than similarly situated White colleagues—including colleagues hired after him—who were subjected to the same performance standards outlined in the Sales Team PIP & Termination Policy in conducting their sales, work

25

requiring substantially equal skill, effort, and responsibility. His White replacement was also paid more despite having a lower quota. These pay disparities, combined with the broader pattern of race-based differential treatment, create genuine disputes of material fact precluding summary judgment.

Sixth, the district court erred in granting summary judgment on Appellant's VWPL claim as Appellee did not contest that claim in its Motion for Summary Judgment or supporting memoranda.

For these reasons, the district court's grant of summary judgment should be reversed, and this case should be remanded for trial.

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON YATES' RACE DISCRIMINATION CLAIMS

### a. Yates established a prima facie case of race discrimination and presented substantial evidence creating genuine disputes of material fact.

The district court erred in granting summary judgment on Yates' race discrimination claims under Title VII, Section 1981, and the Virginia Human Rights Act because a reasonable jury could find that race was a motivating factor in FranConnect's decision to subject Yates—the only Black man on his sales team—to adverse employment actions including discriminatory sales account assignments and reassignments favoring his White colleagues by his new boss, Palay; selective

enforcement and violation of company policies, and FranConnect putting him on three successive PIPs in contravention of its company policies.

The district court's conclusions that Yates' discipline and firing were justified because of his performance and that his comparators were not similarly situated improperly resolved factual disputes in FranConnect's favor and usurped the decision making of the jury. Not only that, but the district court also erred in failing to consider the substantial circumstantial evidence Yates presented in his opposition (his affidavit and 32 supporting exhibits). See Chapman v. Oakland Living Ctr., Inc., 48 F.4th 222, 228 (2022) (finding that the district court erred in awarding summary judgment to the employer by wrongfully excluding any consideration of racial harassment and other discrimination allegedly perpetrated against Plaintiff instead of considering the full scope of the alleged discriminatory conduct).

The district court erred in discounting Yates' affidavit that supported his opposition motion. See Jackson v. Blue Dolphin Communs. of N.C., LLC, 359 F. Supp. 2d 442, 456 (W.D.N.C. 2004) ("There is **no requirement** that an employee's testimony be corroborated in order to apply the mixed-motive framework. Lack of corroboration relates only to the credibility and weight of the evidence, **which are issues for the jury**.") (emph. added); see also EEOC v. Warfield-Rohr Casket Co., 364 F.3d 160, 164 (4th Cir. 2004) ("there is **no requirement** that an employee's testimony be corroborated.") (emph. added); see also, Jackson v. Univ. of

<u>Pittsburgh</u>, 826 F.2d 230, 236 (3d Cir. 1987) ("There is simply **no rule of law** that provides that a discrimination plaintiff may not testify in his or her own behalf, or that such testimony, standing alone, can never make out a case of discrimination that will survive a motion for summary judgment.")

Under Title VII, Section 1981, and the VHRA, it is unlawful for an employer to discriminate against any individual with respect to the terms, conditions, or privileges of employment because of the individual's race. <u>Love-Lane v. Martin</u>, 355 F.3d 766, 786 (4th Cir. 2004). To prevail on a race discrimination claim under Title VII and the VHRA, a plaintiff must show that his race was a "motivating factor" behind the decision causing his injury. <u>Id</u>. To prevail on a Section 1981 claim, a plaintiff must show that race was the "but-for" cause of his injury. <u>Strata Solar, LLC v. Fall Line Constr., LLC</u>, 683 F. Supp. 3d 503, 515 (4th Cir. 2023).

A plaintiff may prove that an employer took action with discriminatory intent through direct evidence *or circumstantial evidence*. <u>Strothers v. City of Laurel</u>, 895 F.3d 317, 327 (4th Cir. 2018). To survive summary judgment, a plaintiff must only raise a genuine dispute regarding intentional discrimination, without needing to prove a prima facie case or pretext, which is what Yates has done in this case. <u>Hollis</u>, 153 F.4th at 392. Claims reach a jury if evidence of animus, disparate treatment, or pretextual justifications suggests a protected status caused the adverse action. <u>Hollis</u>,

28

153 F.4th at 394. Plaintiffs need only raise a reasonable inference of discrimination rather than proving pretext outright. <u>Hollis</u>, 153 F.4th at 392.

The undisputed evidence establishes that Yates is Black. It is also undisputed that Yates suffered multiple adverse employment actions: he was placed on three PIPs, offered a new role with reduced earning potential ("demotion"), and terminated (and replaced by a White woman). PIPs constitute adverse employment actions when they result in reduction in pay, demotion, or substantial change in job duties, which is what happened in Yates' case. <u>Herkert v. Bisignano</u>, 151 F.4th 157, 164 (4th Cir. 2025) (recognizing that a plaintiff alleging Title VII discrimination need not show that harm incurred from a reassignment was "significant"; i.e. he need not show that the injury satisfies a significance test). The plaintiff must show *some* harm from a forced transfer to prevail like some disadvantageous change in an employment term or condition, which Yates has done. <u>Id</u>. After the three PIPs, he was presented the offer of either accepting a demotion or leaving with a severance. Shortly thereafter he was fired.

Here, the central disputes concern whether Yates was meeting legitimate performance expectations and whether White employees were similarly situated and treated more favorably.

<u>Yates was meeting FranConnect's legitimate performance expectations</u>

FranConnect claims Yates was underperforming, but the record establishes genuine disputes regarding this characterization.  <u>See</u> section, **Yates' Recruitment, Hire, and Strong Performance** starting on page 3, above.

Yates  finished 2024 as the Number 3 top-performing sales representative out of twenty-one sales producers, with $43,000 in closed deals. He successfully sold over $1.07 million in annual recurring revenue for FranConnect and closed one of the largest deals in company history: the SnowFox account in December 2024, a month prior to FranConnect firing him. FranConnect's attempt to characterize Yates as a poor performer is contradicted by its own contemporary assessments and by the comparative performance data for the sales team. This creates a genuine dispute whether FranConnect's stated performance concerns were legitimate or pretextual.

Moreover, Volatile, a White colleague, testified that Yates was a "good salesperson" who "tried new things," "thought outside the box," was "not sitting complacent," "did a good job," and "tried to help his fellow sales team members." She found it "crazy" that Yates was placed on a PIP given his well-known sales performance and after seeing Yates' performance on the end of year 2024 sales leaderboard. This contemporaneous reaction from a peer supports an inference that Yates' placement on PIPs was unjustified and discriminatory. This evidence creates a genuine dispute regarding whether Yates was satisfactorily performing his job.

A reasonable jury could credit Yates' strong 3.5 performance rating, the positive comments in his reviews, Stopper's contemporaneous assessment about Yates **being one of the top-producing reps in the company**, and Volatile's testimony that she had seen the [FY 2024 End of Year Sales Team] leaderboard rankings and considered Yates' placement on a PIP to be "crazy." Yates being a top sales rep directly contradicts FranConnect's post-termination characterization of his performance as deficient.

Similarly situated White employees were treated more favorably than Yates

The district court erred in concluding that Yates failed to identify similarly situated employees outside his protected class who were treated more favorably. This Court has emphasized that a comparison between similar employees "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." Haynes v. Waste Connections, Inc., 922 F.3d 219, 223-224 (4th Cir. 2019) (finding that the district court erred in holding that the Plaintiff had failed to establish a proper comparator), Cowgill v. First Data Techs., Inc., 41 F.4th 370, 382 (4th Cir. 2022) citing Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (concluding that same-supervisor requirement does not apply to all factual situations; rather, comparators must be similar in "relevant aspects"). A plaintiff can show evidence that he and his comparators were subject to the same standards and

engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. See Cowgill at 381. Whether employees are similarly situated is a fact-intensive inquiry that must be submitted to a jury when the record supports competing inferences. See Cowgill at 382-383.

Here in this case, Yates' boss, Palay, identified Yates' White peers (Preston Hall, Annie Van Pelt, Daniel Chapman, AJ Griffin, Amy Volatile) who missed their monthly quota attainment; i.e. they did not meet the objective requirements of the Sales Team PIP & Termination Policy but were not disciplined, placed on PIPs, demoted, or terminated for their FY 2024 performance like Yates was. Palay said that no employees he supervised on the sales team were disciplined except for Yates.

Palay's White employees were not subjected to the same disciplinary measures as Yates, so if FranConnect management was pleased with their performance, they should have been doubly pleased with Yates who "clos[ed] some of the largest deals in company history," according to the interim CRO Stopper, and outranked 18 of his White Peers on the FY 2024 End of Year Sales Team Leaderboard. There are genuine disputes of material fact regarding disparate treatment whether Yates provided sufficient comparator evidence. The record demonstrates that Yates' White peers—Amy Volatile, Jessy McGarry, Amanda Griffin, and Bart Van Dessel —were similarly situated but treated more favorably:

- **Amy Volatile**: A White Corporate and then Mid-Market Account Executive rep who was hired in February 2023, the same month as Yates. She closed only three deals (two in 2024) for $8,200 in monthly recurring revenue and $98,400 in annual revenue, and never met her monthly quota. In contrast, Yates closed eleven deals (eight in 2024) totaling $92,250 in monthly recurring revenue and $1,104,000 in annual revenue, and exceeded his monthly quota four times. Volatile received lower annual performance review scores of 2.75 in 2023 and 2.5 in 2024—significantly lower than Yates's 3.5 score, missed her quotas, yet despite her substantially poorer performance, was never placed on a formal PIP. During his deposition, Palay first stated that Volatile was put on an "activity performance improvement plan," but later admitted that she was not put on a formal PIP and that he was not sure where the term "informal pip" came from. Palay never gave Yates the benefit of an informal PIP (i.e. a made up term and not a PIP per FranConnect policy) or activity performance improvement plan.

- **AJ Griffin**: A White Enterprise sales rep who received only a 3.0 score from Palay in her 2024 annual performance review, much lower than Yates' 3.5 score, yet was not placed on PIPs. Moreover, as of January 13, 2025, when Yates was fired, Griffin had not made a single sale as of April 2024, yet she remained employed. This was even after Palay allowed Griffin to poach Yates' accounts giving her strategic advantages Yates was denied.

- **Jessy McGarry**: A White Mid-Market Account Executive, who Palay allowed to poach Yates' accounts to take lucrative Enterprise accounts from his portfolio and who Palay gave preferential treatment to over Yates by allowing her to work outside her assigned mid-market segments. She was allowed to work Enterprise accounts contrary to company standard operating

procedures, closing major deals including Fantastic Sams and Foodtastic that had been assigned to or requested by Yates. Yates was denied these strategic advantages.

- **Bart Van Dessel**: A White Enterprise sales representative who was given both new logo and existing customer accounts.

Unsurprisingly, McGarry and Van Dessel were the only two sales representatives who hit their quotas in 2024, both White, and both permitted to work outside their assigned segment, unlike Yates, which materially and favorably impacted their results in comparison to Yates' results. Yates was not permitted to work outside his assigned segment. This disparate treatment is evidence of discriminatory motive

Here, all the comparators worked on the same sales team, reported to the same supervisor (Palay), were subject to the same written objective requirements of the Sales Team PIP & Termination Policy and FranConnect's Progressive Discipline policy sales, and engaged in comparable or worse conduct (missing sales targets except Van Dessel and McGarry) than Yates. Each of them were engaged in sales; i.e. making calls, emailing, meeting with, and following up with potential or new clients; making pitches; attempting to close deals; etc. Whether one rep had McDonald's as a client or a mom and pop coffee shop, each sales rep had to do the same sales leg work to close deals for FranConnect. FranConnect's superficial distinctions of Account Executive, Account Manager, Mid-Market, and Small and

Medium Size Business, and new logo or current client focused are an attempt to silo Yates to insulate FranConnect from liability. These distinctions in title do not absolve FranConnect from the unlawful selective enforcement of its company policies based on race or negate that the identified comparators are indeed comparators when their functions were essentially the same, corporate sales. The record demonstrates that Yates' White comparators were similarly situated yet treated more favorably than Yates during his tenure there despite missing their quota attainment—without receiving writeups, PIPs, demotions, or termination.

> b. FranConnect's reasons for the adverse treatment are pretextual.

The record contains substantial evidence from which a jury could find that FranConnect's reasons for adverse treatment were pretextual and that race was the true motivating factor. Additionally, FranConnect's stated reason for Yates' termination has shifted throughout this litigation, which is also indicative of pretext. See Smith v. CSRA, 12 F.4th 396, 421 (4th Cir. 2021).

Opoku's termination email stated that Yates was terminated because he "did not accept the lateral role offering." Yet now FranConnect claims the new role was offered "in lieu of terminating his employment" due to performance deficiencies. Contradictory evidence and conflicting explanations offered by an employer create a genuine dispute of material fact, preventing summary judgment. Id.

Deviations from normal procedures themselves are circumstantial evidence from which pretext and discriminatory intent may be inferred. Departures from the normal procedural sequence might afford evidence that improper purposes are playing a role, and deviation from usual procedure can serve as evidence of pretext. As this Court held in <u>Hollis</u>, 153 F.4th at 383 (4th 2025)

> deviations *themselves* are the circumstantial evidence from which pretext and discriminatory intent may be inferred. <u>See</u> <u>Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role."); <u>Cowgill v. First Data Techs., Inc.</u>, 41 F.4th 370, 383 (4th Cir. 2022) (noting deviation from usual procedure as evidence of pretext).)

Evidence that a company failed to follow its own disciplinary policies in firing an employee can also be probative of pretext. <u>Wannamaker-Amos v. Purem Novi, Inc.</u>, 126 F.4th 244, 260-261 (4th Cir. 2025). The selective enforcement of a facially neutral policy only against a member of a protected class supports an inference of discriminatory intent. <u>Merritt v. Old Dominion Freight Line, Inc.</u>, 601 F.3d 289, 302-303 (4th Cir. 2010).

That is exactly what happened to Yates in this case.

Yates has satisfied all requirements for bringing a race discrimination claim. Genuine disputes of material fact exist regarding whether Yates was satisfactorily performing his job, whether his White colleagues were similarly situated, and whether FranConnect's proffered reasons for the inexplicable extensions of a successfully completed PIP and other adverse actions, were pretextual. These are

quintessential jury questions that cannot be resolved as a matter of law on summary judgment. This Court should reverse the district court's grant of summary judgment on Yates' race discrimination claim.

## II.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON YATES' PAY DISCRIMINATION CLAIMS

### a.  Yates established a prima facie case of pay discrimination.

Under Title VII and Section 1981, it is unlawful for an employer to discriminate against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . ." 42 U.S.C. § 2000e-2. To establish a prima facie case of racial pay discrimination under Title VII, a plaintiff must prove that (1) she is a member of a protected class; (2) she was paid less than an employee outside the class; and (3) the higher paid employee was performing a substantially similar job. <u>Kess v. Mun. Emples. Credit Union of Balt., Inc</u>., 319 F. Supp. 2d 637, 644-645 (4th Cir. 2004).

Here, the district court reasoned that based on a pay chart that FranConnect produced, there was only "a $15,000 difference" in pay between Yates' White peer Griffin, but did not make *any* reference to Masterson, Yates' other White comparator who started with a base salary that was $25,000 more than his. JA 625, JA 10 (8:8-18). Also, the court did not reference Yates' White replacement, Menster, being paid $10,000.08 more than him despite being assigned a lower quota than him. JA 625 and JA 2341 (¶14).

37

Evidence produced by FranConnect confirms that Masterson, Griffin, and Menster all Enterprise sales reps like Yates—were earning more base salary than Yates was in the same role despite being less tenured than him. JA 625. Yates was hired in March 2023 with a base salary of $120,000, Masterson was hired in December of 2023 with a base salary of $145,000, and Griffin was hired in April of 2024 with a base salary of $135,000. Id. Yates' White replacement, Menster, who was hired in February 2025 (the month after Yates was fired) was assigned a lower quota than Yates when he started at FranConnect, despite her higher base salary of $130,000.08. JA 2341 (¶14), JA 625. The only difference between them and Yates is that he is Black and they are all White.

Yates performed his job satisfactorily, as noted above, and performed "substantially similar" work requiring the same skill, effort, and responsibility as his comparators working under similar working conditions at FranConnect yet was compensated at a lower rate, treating him worse than his comparators in terms of pay as his base salary was substantially less than theirs at the inception of their employment with FranConnect. Genuine disputes of material fact exist as to why his comparators were paid more than him and why his White replacement was paid more than him despite having a lower quota than him.

Pay discrimination is one of the most pernicious forms of workplace discrimination because it has compounding effects over time, affecting not only

current earnings but also future compensation benchmarks, retirement savings, and economic security. When pay disparities correlate with race and lack legitimate justification, Title VII's remedial purpose requires careful scrutiny. Here, Yates has presented direct comparative evidence from similarly situated White employees and his own White replacement, all of whom received more favorable compensation and in some cases were less qualified or less tenured. Genuine disputes of material fact exist regarding whether Yates performed substantially similar work as his higher-paid White colleagues, whether FranConnect had legitimate, nondiscriminatory reasons for the pay disparities, and whether those reasons were pretextual. These are quintessential jury questions involving credibility, comparative assessments, and inferential reasoning that cannot be resolved on summary judgment.

This Court should reverse the district court's grant of summary judgment on Yates' pay discrimination claim.

## III.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON YATES' RETALIATION CLAIMS

### a.  Yates established a prima facie case of retaliation.

Under the Title VII, Section 1981, and the VHRA it is unlawful for an employer to retaliate against an employee who engages in protected activity. Strothers, 895 F.3d at 327. To establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in protected activity; (2) that the employer took a materially adverse employment action against the plaintiff, and; (3) that a causal

connection exists between the protected activity and the adverse employment action. <u>Id</u>. at 327-328. For retaliation claims, the plaintiff must show a "materially adverse" action, or one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" or otherwise engaging in protected conduct. <u>Herkert</u>, 151 F.4th at 162. A plaintiff can prevail on a retaliation claim based on circumstantial evidence that would allow a reasonable jury to infer retaliation, including evidence of temporal proximity between protected activity and an adverse employment action. <u>Hollis</u>, 153 F.4th at 373 (4th 2025).

Here, the record reflects the following:

(1) Yates engaged in protected activity by complaining to HR and filing an EEOC complaint. According to the timeline,

- On **December 2, 2024**, Yates filed an HR complaint with Opoku, reporting race discrimination with account assignments and reassignments, PIP placement, inconsistent application of high performance expectations, and the in-office policy enforcement. JA 2427-2429.

- On **December 5, 2024**, Yates met with Opoku, who apologized after Yates described the discrimination he had faced and stated she would conduct an internal investigation. JA 1251-1252 (124:1-125:19) (Opoku also admitted that Palay was not formally coached and that after Yates filed his EEOC complaint, HR did not implement any measures to ensure he was not being retaliated against because she believed "*the business practices were fair and that there was nothing to change*").

- On **December 11, 2024**, Yates filed a charge with the EEOC alleging race and pay discrimination and retaliation. JA 51-57. Opoku admitted to receiving an email from the EEOC (notifying her of Yates' complaint). JA 1244 (117:2-18). When pressed, Palay stated that he became aware of Yates' race complaints after Opoku discussed it with him in December 2024, after

40

first stating that he didn't remember when he learned of Yates' complaints. JA 2367-2373 (47: 8– 53:8).

- On **December 30, 2024**, instead of addressing the discrimination, FranConnect retaliated against Yates by offering him two options: (1) move to a lesser Enterprise Account Manager role on January 12, 2025, with significantly lower earning potential (despite the same base salary), as the average deal size for Enterprise new logo is $8.1K, compared to Enterprise upsell at $2.6K, or (2) take a severance package of only 2 months of salary and 2 months of COBRA. JA 2430.

- On **January 13, 2025**, in an attempt to express his retaliation concerns and concerns about the new position offer and to negotiate better terms, Yates emailed Opoku the reasons why he could not accept the lesser position as offered, and noted that the offer was extended only <u>after</u> he had engaged in protected activity. He stated that he had "serious concerns about FranConnect's commitment to equitable treatment and professionalism" based on the retaliation he was facing. JA 2431-2432. Specifically, he informed Opoku that since filing his EEOC claim, he had been retaliated against with heightened performance monitoring, false allegations being made about his sales metrics, and the ultimatum FranConnect gave him to either accept the lesser role or face termination. JA 2431-2432 & JA 2344 (¶29).

(2) FranConnect took materially adverse employment actions against him including offering him a demotion and firing him.

(3) that a causal connection exists between the protected activity and the adverse employment action.

The temporal proximity between Yates' protected activity and FranConnect's adverse actions supports an inference of retaliation and pretext. Only 28 days after filing his internal discrimination complaint with HR and 19 days after filing his EEOC charge, on December 30, 2024, FranConnect offered Yates

the purported "lateral" aka "demoted" role with significantly reduced earning potential or the option to leave with a severance.

Just fourteen days later, on January 13, 2025—the *very same day* Yates explained to Opoku why the new role was a demotion and referenced his protected activity —FranConnect fired him via email.

Evidence that an alleged adverse action occurred shortly after the employer became aware of protected activity is sufficient to satisfy the causal element of a prima facie case. Strothers, 895 F.3d at 337.

The core disputes of genuine issues of material fact are: (1) whether the new role offered constituted a demotion leading to constructive discharge, and (2) whether a causal connection exists between the adverse employment action and Yates's protected activity. The district court recognized the temporal proximity for his termination; however, it inappropriately characterized the new job offer as not being onerous and simply stated that because he did not accept that offer that his case would not "hold up on a retaliation claim." JA 11 - 12 (9:23-10:7).

Offering an employee a choice between a demotion with 68% lower earning potential or termination—after he complains of discrimination—is precisely the type of action that would dissuade workers from exercising their statutory rights. Moreover, permitting employers to terminate employees for declining demotions offered as purported "lateral moves" would create perverse incentives: employers

42

could circumvent anti-retaliation protections by offering demotions disguised as lateral transfers, then terminating employees who refuse. This Court should not countenance such subterfuge. These facts create compelling questions about FranConnect's true motivation that cannot be resolved on summary judgment. A jury should have been permitted to resolve the issues of whether the "lateral role" was a demotion and whether the shifting reasons for firing Yates were pretextual and truly motivated by his protected activity.

This Court should reverse the district court's grant of summary judgment on Yates' pay retaliation claim.

## IV. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON YATES' VIRGINIA WHISTLEBLOWER PROTECTION LAW ("VWPL") CLAIM

In FranConnect's Motion for Summary Judgment and Memorandum in Support of Summary Judgment, FranConnect did not request that the court dismiss Yates' VWPL claim. The Court committed error in dismissing that claim at the trial stage. This Court should reverse the district court's grant of summary judgment on Yates' VWPL claim.

## CONCLUSION

Permitting summary judgment in employment discrimination cases where, as here, substantial circumstantial evidence supports an inference of discriminatory motive would undermine Title VII's broad remedial purposes. The evidence Yates

43

presented—disparate discipline, selective enforcement of company policies, account reassignments favoring White employees, admission by HR and Palay of policy violations, and temporal proximity between protected activity and termination—creates the type of mosaic from which a jury could reasonably infer discriminatory motive. This Court should reverse the district court's grant of summary judgment and remand for further proceedings on each of Yates' claims.

Dated: July 21, 2026

Respectfully submitted,

JAMES YATES,

By Counsel

*/s/Monique A. Miles*

Monique A. Miles, Esquire
OLD TOWNE ASSOCIATES, P.C.
201 N. Union Street, Ste. 110
Alexandria, Virginia 22314
(Ph) 703-519-6810
mmiles@oldtowneassociates.com

Arinderjit Dhali
Dhali PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
(Ph) 202-556-1285
ajdhali@shalilaw.com

Attorneys for Plaintiff-Appellant James Yates

# REQUEST FOR ORAL ARGUMENT

Yates respectfully requests that this Court hear oral argument in this case. Because of the complexity and history of this matter, oral argument would assist the Court's consideration.

Dated: July 21, 2026

Respectfully submitted,

JAMES YATES,

By Counsel

<u>*/s/Monique A. Miles*</u>

Monique A. Miles, Esquire
OLD TOWNE ASSOCIATES, P.C.
201 N. Union Street, Ste. 110
Alexandria, Virginia 22314
(Ph) 703-519-6810
mmiles@oldtowneassociates.com

Arinderjit Dhali
Dhali PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
(Ph) 202-556-1285
ajdhali@shalilaw.com

Attorneys for Plaintiff-Appellant James Yates

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,901 words, as calculated by Word 365, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman, a proportionally spaced typeface.

Dated: July 21, 2026          Respectfully submitted,

JAMES YATES,

By Counsel

*/s/Monique A. Miles*

Monique A. Miles, Esquire
OLD TOWNE ASSOCIATES, P.C.
201 N. Union Street, Ste. 110
Alexandria, Virginia 22314
(Ph) 703-519-6810
mmiles@oldtowneassociates.com

Arinderjit Dhali
Dhali PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
(Ph) 202-556-1285
ajdhali@shalilaw.com

Attorneys for Plaintiff-Appellant James Yates

## CERTIFICATE OF SERVICE

I certify that on July 21, 2026, I electronically filed this Opening Brief of Appellant Yates using the CM/ECF System, which will send notice of the filing to the following registered CM/ECF users:

Heather M. Lambert (VSB No. 79175)
NELSON MULLINS RILEY & SCARBOROUGH
1021 E. Byrd Street, Suite 2120
Richmond, VA 23219
Heather.Lambert@nelsonmullins.com
Tel.: 804.533.3868
Fax.: 804. 616.4129

Kraig B. Long
NELSON MULLINS RILEY & SCARBOROUGH
100 S. Charles Street, Suite 1600
Baltimore, MD 21201
Kraig.Long@nelsonmullins.com
Tel.: 443.392.9499
Counsel for Defendant-Appellee

*/s/Monique A. Miles*